

**U.S. Department of Justice**

Criminal Division

---

*Fraud Section*  
*1400 New York Avenue, NW*  
*Washington, D.C. 20530*

*Washington, D.C. 20530*

\_\_\_\_ FILED  \_\_\_\_ ENTERED
\_\_\_\_ LOGGED  \_\_\_\_ RECEIVED

OCT 0 6 2021

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

BY _____ DEPUTY

August 31, 2021

Tiffany E. Feder
Law Offices of Tiffany E. Feder
16661 Ventura Blvd.
Suite 410
Encino, CA 91436

Re: <u>United States v. Elad Bigelman</u>

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Elad Bigelman (hereinafter "Defendant"), by the U.S. Department of Justice, Criminal Division, Fraud Section ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by September 7, 2021, it will be deemed withdrawn. The terms of the Agreement are as follows:

<u>Offense of Conviction</u>

1. The Defendant agrees to plead guilty to Count One of the First Superseding Indictment, which charges the Defendant with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. The Defendant admits that the Defendant is, in fact, guilty of the offense and will so advise the Court.

<u>Elements of the Offense</u>

2. The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the time alleged in the First Superseding Indictment, in the District of Maryland:

    a. Two or more persons agreed to do something that federal law prohibits, that is, to commit wire fraud, as charged in the First Superseding Indictment; and

    b. The Defendant knew of the conspiracy and willfully joined the conspiracy.

Penalties

3. The maximum penalties provided by statute for the offense to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1349 | N/A | 20 years | 3 years | $250,000 or twice the gross gain or loss, whichever is greater | $100 |

    a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

    b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment up to the entire original term of supervised release if permitted by statute, followed by an additional term of supervised release.

    c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

    d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

    e. Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

    f. Collection of Debts: If the Court imposes a fine or restitution, this Office will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and, if applicable, to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete

and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## Waiver of Rights

4. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

    a. If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    c. If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

    d. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

    e. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g. If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551–3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6. This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

 a. This Office and the Defendant further agree that the applicable base offense level is a **level 7** pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2B.1.1.

 b. This Office and the Defendant further agree that:

  i. an **18**-level enhancement applies pursuant to U.S.S.G. § 2B.1.1(b)(1)(J) to account for the fact that the loss amount attributable to the Defendant during the period of time he was involved in the conspiracy was at least $3,766,449;

  ii. a **4**-level enhancement applies pursuant to U.S.S.G. § 2B1.1(b)(2)(B) because the offense resulted in substantial financial hardship to five or more victims;

4

iii. a 2-level enhancement applies pursuant to U.S.S.G. § 2B1.1(b)(10) because the fraudulent scheme was committed abroad and/or sophisticated means were used to effectuate the offense and the Defendant intentionally engaged in or caused the conduct constituting sophisticated means; and

iv. a 2-level enhancement applies pursuant to U.S.S.G. § 3B1.1(c) because the defendant was a manager or supervisor.

c. This Office and the Defendant do not agree as to whether an additional 2-level enhancement applies pursuant to U.S.S.G. § 2B.1.1(b)(1)(K) because the loss attributable to the Defendant exceeded $9,500,000, but the parties agree that this Office shall be able to advocate for such an enhancement before the Court and that the Defendant may oppose such an enhancement.

d. This Office does not oppose a 2-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional 1-level decrease in recognition of the Defendant's acceptance of personal responsibility for the Defendant's conduct. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

9. At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office reserves the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office deems relevant to sentencing.

### Waiver of Appeal

10. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

    a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute, to the extent such challenges legally can be waived.

    b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

        (i) The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum; and

        (ii) This Office reserves the right to appeal any sentence below a statutory minimum.

    c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Forfeiture

11. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

12. The Defendant agrees to consent to the entry of an order of forfeiture and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

13. The Defendant agrees to assist fully in the forfeiture of property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the

forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

14. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

## Defendant's Conduct Prior to Sentencing and Breach

15. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

16. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement; and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including the attached Statement of Facts and any other statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. The Defendant waives any and all claims under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal statute or rule, to suppress or restrict the use of any such statements. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea.

## Court Not a Party

17. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding

prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

18. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
U.S. Department of Justice, Criminal Division

By: _Jessee Alexander-Hoeppner_ 10/06/2021

Jessee C. Alexander-Hoeppner
Kate T. McCarthy
Trial Attorneys, Fraud Section

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

09/02/2021
Date

Elad Bigelman
Defendant
10/6/21

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

10/06/2021
Date

Tiffany E. Feder, Esq.

prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

18. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
U.S. Department of Justice, Criminal Division

By: _____
Jessee C. Alexander-Hoeppner
Kate T. McCarthy
Trial Attorneys, Fraud Section

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

08\31\2021
Date

_____
Elad Bigelman
Defendant

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

09/02/2021
Date

_____
Tiffany E. Feder, Esq.

8

## ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

### The Defendant and Related Individuals and Entities

1. From in or around August 2014 through in or around September 2017, the Defendant Elad Bigelman worked on behalf of an Israel-based business, Yukom Communications ("Yukom"), which provided sales and marketing services, including "retention services," for two internet-based businesses with the brand names BinaryBook and BigOption (collectively "the Binary Options Organization").

2. In or around August 2014, the Defendant was hired by Yosef Herzog to work as a sales representative on behalf of the Binary Options Organization. Throughout the Defendant's tenure with the Binary Options Organization, Yakov Cohen and Yosef Herzog were principals of and had ownership interests in the Binary Options Organization.

3. BinaryBook and BigOption representatives sold and marketed financial instruments known as "binary options" to customers located throughout the world, including in the United States and within the District of Maryland.

4. In or around April 2015, the Defendant was promoted to brand manager for BigOption. As brand manager, Bigelman supervised BigOption sales representatives, and was supervised by Cohen, Herzog, and Yukom Chief Executive Officer Lee Elbaz.

### Background on Binary Options and Related Definitions

5. A "binary option" was a type of option contract in which the payout depended on the outcome of a discrete event, typically related to whether the price of a particular asset — such as a stock or a commodity — would rise above or fall below a specified amount. Unlike standard options, investors in binary options were not being given the opportunity to actually purchase a stock or a commodity but, rather, were effectively predicting whether its price would be above or below a certain amount at a certain time of the day. The option holder was typically promised that when the binary option expired, the option holder would receive either a pre-determined amount of cash or nothing.

6. A "conversion" representative was a salesperson responsible for converting a prospective binary options customer into an investor and obtaining an initial deposit of funds.

7. A "retention" representative was responsible for working with the investor going forward with the goal of obtaining additional deposits. As part of this effort, the Defendant and

9

other retention representatives were responsible for educating clients on how to use the BinaryBook and BigOption platforms.

8. A "bonus" was an amount of purported funds that representatives of BinaryBook and BigOption could contribute to an investor's account to be used in trading.

9. A "risk free trade" or "insured trade" was a trade offered by representatives to investors in which the investors' accounts would be reimbursed by "bonus" funds in the event of a losing trade.

**The Defendant's Participation in the Conspiracy and Fraudulent Scheme**

10. Representatives of BinaryBook and BigOption, under the training and direction of Elbaz, Cohen, Herzog, Ori Maymon, Nissim Alfasi, the Defendant, and others, agreed to induce BinaryBook and BigOption investors to deposit funds based on material misrepresentations, including:

    i. false statements and material omissions regarding the alignment of financial incentives between investors and representatives — *i.e.*, claiming to represent the interests of investors when, in fact, they were not representing the interests of investors;

    ii. false statements and material omissions regarding the suitability of binary options as investments and returns on investments in binary options;

    iii. false statements and material omissions about the names, qualifications, and physical location of representatives assisting investors;

    iv. false statements and material omissions regarding investors' ability to withdraw investment funds and about the reasons that funds could not be withdrawn; and

    v. false statements and material omissions regarding — and the deceptive use of — so-called "bonuses," "risk free trades," and "insured trades."

11. BinaryBook and BigOption representatives communicated with investors through the internet and communicated with clients by email and telephone. The calls with clients were recorded and used for training purposes.

12. BinaryBook and BigOption representatives were not representing the interests of investors. When investors lost money, the owners of BinaryBook and BigOption profited.

13. While the Defendant was a sales representative, his commissions were based on net deposits — that is, how much money his clients deposited minus any amounts clients were able to withdraw. As brand manager, the Defendant's commissions were based on the net deposits of BigOption sales representatives.

14. BinaryBook and BigOption representatives falsely referred to themselves as "analysts," "brokers," and "traders" to potential investors, when in fact they were sales representatives. The Defendant did not have a background in finance, business, or the financial markets.

15. The Defendant had direct contact with investors and induced clients to invest in binary options by falsely representing the return on investment and using "bonuses" to convince clients to continue to deposit funds. The Defendant also attempted to prevent investors from withdrawing funds from their accounts.

16. The Defendant used aliases — referred to internally as "stage names" — while working on behalf of the Binary Options Organization. The Defendant used his stage names — "John Goldman" and "Michael Goldberg" — to interact with client investors, and he also falsely presented his location and professional qualifications to client investors.

17. As an example, between on or about January 26, 2015 and on or about March 3, 2015, the Defendant emailed numerous investors and falsely told them "my job is to make sure your account will be profitable so we both will make money here." The Defendant further offered investors "a managed account, where I will do all the trading on your behalf by making sure we will make about 15%-20% profits a month."

18. On or about February 10, 2015, in an email chain starting with one of the emails referenced in paragraph 17 above, an investor asked the Defendant about his "track record on making 15 - 20 % profit on the account" and whether "there [is] a big risk involved." In response, the Defendant informed the investor that "[t]he min[imum] that we make is 15% a month."

19. On or about May 20, 2015, the Defendant emailed the BigOption retention agents about reassigning potential investors due to employee departures from Yukom. The Defendant explained, "[y]our job is to call them and to tell the CM [*i.e.*, the customer] that the previous broker got promoted and you are going to handle the account for them." The Defendant further advised that "[t]here is a lot more money to take from these people."

20. A tactic to prevent withdrawals was to put an account "under investigation" to delay the withdrawal while sales representatives tried to convince the investor to cancel the withdrawal. For example, on or about May 20, 2015, the Defendant emailed Jeebun about "an account that wants to withdraw profits," stating "[w]e need to do what we talked about this week." Jeebun replied: "will get his account under investigation."

21. On or about November 30, 2015, a retention agent emailed the Defendant, Maymon, and Elbaz to ask for "thoughts" on an "[em]ail I sent to clients" with the subject line "BigOption - Pension = safe?," which made representations including "[i]f you want your savings, pension and retirement money to be safe! All you need to do is to put it in binary account."

22. On or about February 25, 2016, a sales representative who was in charge of training at Yukom emailed a "Call script" to managers including the Defendant, Maymon, and Alfasi. The script included various misrepresentations to be made to investors, including that "I am only here to help you generate the profit you want to achieve" and "that my company is very interested in helping you generate the biggest possible profit in the account." Other misrepresentations in the

script included claims to "manage around 80 clients which are generating a profit of between 15 - 25 % on a monthly basis," and to have an "average success rate of 70%," which would yield "a profit of 19%." The script also claimed that a "bonus is there to help us leverage the account," and the investor "can always withdraw your initial investment and the profit but you cannot withdraw the bonus," but it did not include a discussion of any turnover requirements imposed by the bonus.

23. In furtherance of the conspiracy, members of the conspiracy directly communicated via international wire communications with victim-investors within the District of Maryland.

24. In furtherance of the conspiracy, the Defendant was responsible for at least $3,766,449 in investor losses based on his direct interactions with investors as a sales representative and his managerial role as a team leader and brand manager for BigOption.

SO STIPULATED:

_Jessee Alexander-Hoeppner_ 10/06/2021
Jessee C. Alexander-Hoeppner
Kate T. McCarthy
Trial Attorneys, Fraud Section

_Elad Bigelman_ 10/6/21
Elad Bigelman
Defendant

_Tiffany E. Feder_ 10/6/2021
Tiffany E. Feder, Esq.
Counsel for Defendant

12